UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MARK SANFORD and
TAMMY SANFORD,

      Plaintiffs,

v.                                   Case No.:  12-11526
                                   Judge:  Hon. Thomas Ludington

PORTFOLIO RECOVERY
ASSOCIATES, LLC,

      Defendant.
_____/

**OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION,
OVERRULING PLAINTIFFS' OBJECTIONS, DENYING PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT, AND GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

The Fair Debt Collection Practices Act is a consumer protection statute.  15 U.S.C. §

1692(e).  But its protections are "not one-sided."  *Fed. Home Loan Mortg. Corp. v. Lamar*, 503

F.3d 504, 510 (6th Cir. 2007).  It also protects debt collectors who play by the rules.  This case

illustrates those provisions of the act.

**I**

**A**

Plaintiffs Tammy and Mark Sanford are husband and wife.  This case begins, however,

years before their wedding, at a time that Tammy was married to a man named Scott.[1]

In 1986, Tammy obtained a J.C. Penny credit card.  Six years later, she and Scott were

divorced.  After another six years, Tammy stopped making payments on her J.C. Penny account.

---

[1] Evidently, that is.  The record is clear that Tammy and Scott divorced around 1992.  The record, however,
does not disclose when they were married.  Nor does it disclose Scott's surname.

At the time Tammy stopped making payments (in 1998) her J.C. Penny account had an unpaid balance of $106.08.

It is not clear from the record when Tammy married Mr. Sanford.  What is clear is that Mr. Sanford was never listed on Mrs. Sanford's J.C. Penny account.  It is solely her debt of $106.08.  It is this debt — and its attempted collection — that gives rise to this case.

### B

Defendant Portfolio Recovery Associates, LLC is a collection agency.  It acquires consumer debts and collects on them.  In May 2007, Defendant acquired Mrs. Sanford's debt to J.C. Penny.

Defendant first tried to contact Mrs. Sanford on May 4, 2008, through a phone number ending in digits –9029.  No answer.  Defendant periodically called the number for the next six months.  Each call went unanswered.

### C

On February 15, 2009, Defendant contacted Mrs. Sanford on a phone number ending in the digits –4911.  It is not clear from the record who answered.  What is clear is that someone did, but then hung up without speaking to Defendant.

Defendant continued to call the phone number ending in the digits –4911 three or four times a month.  Each call either went unanswered or to voicemail.  The voicemails were not returned.   Years passed.

Finally, after a little more than three years of trying, in July 2011 Defendant had a phone conversation with someone at the Sanford residence.  (Of course, Defendant was not simply trying to talk with someone at the Sanford residence — but to talk to the debtor, Mrs. Sanford. Defendant never succeeded in this endeavor.)

**D**

Over the next eight months, Defendant's calls reached someone at the Sanford residence four times.  And on one occasion, Defendant was called by Mr. Sanford.  Each of these five conversations is addressed in turn.

**1**

July 1, 2011.  This was the first time Defendant successfully reached a person at the Sanford residence.  Mr. Sanford.  But the conversation began after Defendant called and a child answered the phone:

| | |
|---|---|
| [Collector]: | Hello? |
| [Unidentified Child]: | Hello? |
| [Collector]: | Hi, can I talk [sic] Tammy please? |
| [Unidentified Child]: | Tammy is sleeping right now. |

At this point in the conversation, Mr. Sanford took the phone from the child:

| | |
|---|---|
| [Mr. Sanford]: | Hello? |
| [Collector]: | Hi, yes sir.  I was trying to reach Mrs. Sanford.  I guess she's asleep right now.  Is this her husband? |
| [Mr. Sanford]: | Yes. |
| [Collector]: | How you doing today Mr. Sanford. |
| [Mr. Sanford]: | Ok. |
| [Collector]: | Sir, my name is Joshua.  I'm calling today from here at Portfolio Recovery Associates in regards to your wife's old J.C. Penny account that's been placed in my office.  It has a low balance of $106.08.  Now before going into more specifics sir I have to get some formalities out of the way.  Our call may be monitored or recorded.  This is an attempt to collect a debt by a debt collector and information obtained will be used for that purpose.  Sorry we have to do that every call.  Um, now with a |

|                  | balance of the $106.08, just want to touch base and see if you all had the funds to go ahead and resolve this account today? |
|---|---|
| [Mr. Sanford]: | We don't have it today. I just got back from work after being off for 3 months. Well we're waiting for Uncle Sam to send us a check and when he does for $106.00 that's reasonable, just pay it off. Um, if you call back say, week to 10 days business days, um, we should have already received that money. So, and we can just whether, credit card or you know whatever over the phone, I'll just give you the money. |
| [Collector]: | Well, actually if you'd like sir, we can actually secure that payment check by phone with you — uh — |
| [Mr. Sanford]: | We don't have a checking account. |
| [Collector]: | Oh, no checking or savings? |
| [Mr. Sanford]: | No, I don't want to do that until I know the money's in there because I don't want to have anything happen. That's how we got jammed up in the first place. |
| [Collector]: | Yeah, well that's what I was going to say. We actually postdate it for 3 weeks out. |
| [Mr. Sanford]: | No. I'd rather wait to I know the moneys there and then tell ya. |
| [Collector]: | Ok. Not a problem sir. |
| [Mr. Sanford]: | Just to be safe. I mean, not to be rude or anything. |
| [Collector]: | Oh, trust me, trust me sir. You're not being rude at all. |
| [Mr. Sanford]: | Ok. I mean, cuz I got my car insurance and house payment coming out of that and I can't make a mistake and then have you guys take money and me not realize it or forgotten about whatever. So — |
| [Collector]: | Right. |
| [Mr. Sanford]: | And then have a house payment bounce or the insurance not covered. So — |

| | |
|---|---|
| [Collector]: | Absolutely. |
| [Mr. Sanford]: | But no, if you can, I mean, honestly — week to 10 days, call me back and I'll for [sic] the $106 I'm not gona [sic] get a call. |
| [Collector]: | Ok. Well what I can do is put a 7 day hold on the account and the accounts right now it's an automated dialing system. |
| [Mr. Sanford]: | Ok. . . . |
| [Collector]: | Alright. I'll go ahead and get this notated for you Mr. Sanford and guess I'll just check back — let's see today's the 1st — say around the 13th? |
| [Mr. Sanford]: | Sure, that's enough time by then. |
| [Collector]: | Ok. You have a good day. |
| [Mr. Sanford]: | Alright. Thank you, you too. |
| [Collector]: | Bye. |
| [End of call] | |

Defendant next called the Sanford residence 16 days later. No answer. Defendant called again on July 18. No answer. July 24, August 5, August 17, August 23, August 30, September 4, September 16. Still no answer. And so it went for five months.

## 2

December 15, 2011. This was the second time that someone at the Sanford residence answered Defendant's phone call. A woman whose identity is not disclosed in the record answered. In full, the brief conversation was:

| | |
|---|---|
| [Collector]: | Tammy? |
| [Unidentified Woman]: | No, can I take a message? |
| [Collector]: | Sure. Um, but what time Tammy will be available so I could just call back? |

[Unidentified Woman]:     Um, not till later this afternoon.

[Collector]:              Any number where I can call her now?

[Unidentified Woman]:     This, no, this number.

[Collector]:              Alright.  I might just call back.  Thank you.

[End of Call]

Defendant did call back.  Multiple times over the following month.  Again, each call went unanswered or to voicemail.

### 3

January 11, 2012.  For the third time Defendant reached someone at the Sanford residence.  Again, it was Mr. Sanford.  Unlike the previous conversation with Mr. Sanford, Defendant found the gentleman somewhat less amiable.  The conversation was brief:

[Collector]:              Can I talk to Tammy?

[Mr. Sanford]:            She's not available can I get a message please.

[Collector]:              Are you the husband?

[Mr. Sanford]:            Yes I am.

[Collector]:              Mr. Sanford, right?

[Mr. Sanford]:            That would be me.

[Collector]:              Ok.  Mr. Sanford, this is Mona.  I'm calling from Portfolio Recovery Associates regarding her account with J.C. Penny.  This is an attempt to collect a debt by a debt collector and any information obtained will be used for that purpose.  Our calls may be monitored or recorded.

[Mr. Sanford]:            You know what?  That's just great cuz this debt was back in 1989 which means that you guys are falsifying records.  Now we've already got an attorney.  I am recording this just to let you know.  So I'd appreciate it

> if you folks would just quit calling us and our attorneys will be in touch.  Because what you're doing is against the law.  Thank you so much.

[Call Terminated]

Defendant, although it did not know the name of the attorney (much less how the attorney could be contacted) did not call again.  A week passed.

### 4

January 19, 2012.  On the advice of his attorney,[2] Mr. Sanford called Defendant.  He began the conversation by representing that he was returning Defendant's call:

| [Collector]: | Hello? |
|---|---|
| [Mr. Sanford]: | Hello? |
| [Collector]: | Hi, I apologize.  I dropped my phone.  What can I do for you? |
| [Mr. Sanford]: | Yes, ma'am.  I'm returning a call from you folks.  My name is Mark Sanford. |
| [Collector]: | Looks like we're looking for a Tammy Sanford. |
| [Mr. Sanford]: | That's my wife.  Now I've spoken to agent on January 11th — |
| [Collector]: | — Or a Scott [redacted]? . . .  We've got a Scott [redacted] too.  You don't know that person? |
| [Mr. Sanford]: | Oh yea, that's her ex-husband.  That was her name back before '93. |
| [Collector]: | Ok.  So [we]'re just connecting the names. |
| [Mr. Sanford]: | Yeah. |
| [Collector]: | Ok.  What can I do for you sir? |

---

[2] More precisely, Mr. Sanford's attorney's "assistant."  *See* Sanford Dep. 49:4–50:7, Sept. 4, 2012 (quoted below).

| | |
|---|---|
| [Mr. Sanford]: | Ok.  Well, we've never received anything in writing when I spoke with an agent on January 11th. |
| [Collector]: | Uh huh. |
| [Mr. Sanford]: | I asked her ok, you know, please, you don't need to call this number until you send me like some paper work or something and I haven't received anything yet.   We don't even know what this is about. |
| [Collector]: | It is a J.C. Penny's account. |
| [Mr. Sanford]: | From back from when, ma'am? |
| [Collector]: | Ok.  Just to make sure that we have the right Tammy Sanford — |
| [Mr. Sanford]: | Yeah. |
| [Collector]: | Date of birth [redacted]? |
| [Mr. Sanford]: | Yeah. |
| [Collector]: | Ok.  It looks like this is a pretty old account.  It's from — it was opened 1986 and paid on until 1998 and then at that point in time there was a balance left of $106.08. |
| [Mr. Sanford]: | Ok.  Then when did you folks get it? |
| [Collector]: | Looks like we've had the account since May 24, 2007. |
| [Mr. Sanford]: | Ok.   So they didn't even bother to file for another 9 years? |
| [Collector]: | Well actually I don't know — I don't know what happened you know; in between the time that we had it and J.C. Penny's had it because we're a third party collection agency.  But my company, we have spoke to your wife and your wife told us in July that she was going to mail us out a check. |
| [Mr. Sanford]: | In July of what year? |
| [Collector]: | July of 2011.  July 1 of 2011 at 10:29.[3] |

---

[3] This July 1 conversation, as noted, was actually with Mr. Sanford.  It was he who said "I just got back from work after being off for 3 months.  Well we're waiting for Uncle Sam to send us a check and when he does for

[Mr. Sanford]:        Well, I, I doubt you spoke to my wife for some reason — my wife — for some reason that is — we weren't even aware of that —

[Collector]:        It says —

[Mr. Sanford]:        We get a credit report and then all of a sudden —

[Collector]:        It just says —

[Mr. Sanford]:        — and all of a sudden these phone calls started.

[Collector]:        It says spouse just got back to work from being off for 3 months.  This is what your wife told us.  And married — said that she would send a check off in the next 7 to 10 business days for the balance.

[Mr. Sanford]:        Ok.  Um, I'll have to talk to her about that.  I don't recall that conversation at all but isn't there a statute of limitations of 6 years on an account?

[Collector]:        There's a statute of limitation and it's just for the amount of time we're legally able to report on your credit report.  That's actually why they were giving you a call.  Because at this point in time because it is tax season — I'll be very honest with you — they've worked with our monthly percentages and because it is tax season, they'd be willing to clear the account for 50% of what is owed.  Which would put the balance at $53.04.  So if you guys set up a check by phone for $53.04, you know, we don't want to call you guys.  You guys don't enjoy us calling you.  I mean nobody does, you know.  We are debt collectors, but, for $53.04 we'll call it good and move it out.  I mean for $106 in an account that's old we —

[Mr. Sanford]:        Yeah, I just don't understand it.  But could you guys file a lawsuit against us because of this?

[Collector]:        No.  It's $106.00.  It's going to cost us more, you know.  No, it's $106.00.  That's why I'm saying for $53.04 we

---

$106.00 that's reasonable, just pay it off.  Um, if you call back say, week to 10 days business days, um, we should have already received that money.  So, and we can just whether, credit card or you know whatever over the phone, I'll just give you the money."

are going to leave you alone and you know, you're going to sleep better.

[Mr. Sanford]:          Ok. Well and what is your name ma'am?

[Collector]:            Brenda.

[Mr. Sanford]:          Brenda. Ok. Well, let me speak to her and find out what's going on and all that and because I don't even — you know — if you're looking for Scott too — I mean, that's —

[Collector]:            No, no, no. That's on a different matter and that's what I was getting ready to tell you too. I'll go ahead and get that number removed so that way we're not calling you. It's not a joint account. She's the only person on this account and it's under Tammy Sanford.

[Mr. Sanford]:          Ok.

[Collector]:            But yeah, this isn't — [Scott's] dealing is totally different than this. It just pulled up when you called in it's pulled up off your incoming number and the phone number was connected for both Tammy and Scott.

[Mr. Sanford]:          Ok. Well you can definitely remove him.

[Collector]:            Yeah, I will.

[Mr. Sanford]:          Ok.

[Collector]:            But —

[Mr. Sanford]:          Well I will get back with you.

[Collector]:            Ok. Then I will —

[Mr. Sanford]:          Alright, thank you so much.

[Collector]:            Thank you. Bye bye.

[Mr. Sanford]:          Bye bye.

[End of Call]

In his deposition, Mr. Sanford was asked about why he called Defendant when he was represented by an attorney. Counsel began by inquiring:

| | |
|---|---|
| [Defense Counsel]: | Did you ever call PRA after you hired Nitzkin and Associates? |
| [Mr. Sanford]: | No, I've never called them, ma'am. |
| Defense Counsel]: | Okay. |
| [Mr. Sanford]: | That I'm aware of. Don't take that as a quote. I might have at some point over the last 18 years, but recently I don't recall. |
| Defense Counsel]: | But after you hired — |
| [Mr. Sanford]: | No, after I — no, I can't say that, because I believe the assistant Julie had me call to discuss the bill with Portfolio, but that's — if that was — if that is true, then I did call one time, that I'm aware of. |
| Defense Counsel]: | Who is the assistant, Julie? |
| [Mr. Sanford]: | Lamanski. Is that how you pronounce her last name? |
| Defense Counsel]: | Is she an assistant at Nitzkin and Associates? |
| [Mr. Sanford]: | Yes, ma'am. |
| Defense Counsel]: | Okay. And she — after you hired Nitzkin and Associates, she instructed you to call PRA to discuss the JC Penney debt? |
| [Mr. Sanford]: | I believe so. |

Asked why Nitzkin & Associates directed him to call Defendant, on advice of counsel Mr. Sanford invoked the attorney-client privilege and declined to answer.

As noted, the January 19 call that Mr. Sanford made to Defendant ended with Mr. Sanford promising Defendant to "get back with you." Three months passed. Mr. Sanford did

not "get back with" Defendant.  Nor did his wife.  Nor the attorney.  (And, as noted, at this point Defendant knew neither the attorney's name nor his contact information.)

**5**

March 11, 2012.  This was the date of the fifth and final conversation between Defendant and the Sanford residence.  Again, Mr. Sanford answered Defendant's call:

| | |
|---|---|
| [Collector]: | Hi, may I speak with Tammy? |
| [Mr. Sanford]: | She's not available — leave a message please? |
| [Collector]: | Yes sir.  Alright, could you write down my name and number for her? . . .  I was calling with Portfolio Recovery Associates just trying to follow up on a business matter. |
| [Mr. Sanford]: | Ok.  Um, I'm pretty sure you've been contacted by our attorneys already.  Um, now which bill is this your calling for? |
| [Collector]: | Um, ok.  Is this Mr. Sanford, her husband? |
| [Mr. Sanford]: | Yes it is.  This is her husband. |
| [Collector]: | Ok.  By law I just got to advise you real quick our calls may be monitored or recorded for quality assurance this is — |
| [Mr. Sanford]: | That's that's that's fine cuz you're being recorded right now anyways, so. |
| [Collector]: | This is an attempt to collect a debt by a debt collector and any information obtained will [be used] for that purpose.  Now, I was calling reference to a J.C. Penny's account. |
| [Mr. Sanford]: | From 1989. |
| [Collector]: | Um, actually it was opened 1986.  And it was paid on to 1998. |

[Mr. Sanford]:          Ok.  Well let's see in 98 and the state law says that after 6 years — Uh you're not supposed to be calling anymore

[Collector]:            That's not true sir.

[Mr. Sanford]:          Well, you know what, after 6 years the bill is already been washed by state law.

[Collector]:            I'll just put it as a refusal to pay.

[Mr. Sanford]:          I'm not giving you folks anything.  I've got your name.

[Collector]:            Yes sir.

[Mr. Sanford]:          You heard me state that you know that it is has been 6, over 6 years and you're telling me that you're still allowed to do this.

[Collector]:            Yes sir.

[Mr. Sanford]:          And like I said, you're being recorded also.   I'm shipping this to the attorney.

[Collector]:            That's fine.

[Mr. Sanford]:          They are called Nitzkin & Associates.  Um, I will make sure that they are aware of this tomorrow.

[Collector]:            Ok.

[Mr. Sanford]:          And give them your number and name and then you guys can deal with this and take me off your calling list once you talk to the attorneys.

[Collector]:            Ok.  You would have to put that in writing and what's their information?

[Mr. Sanford]:          Well the attorneys will take care of that so —

[Collector]:            Ok.  Ok, what's their information sir?

[Mr. Sanford]:          It's Nitzkin & Associates.

[Collector]:            And do you have number for them?

| | |
|---|---|
| [Mr. Sanford]: | Um, I don't have it right now but I'll guarantee you they'll be getting a hold of you tomorrow. |
| [Collector]: | Ok. |
| [Mr. Sanford]: | This is like the 5th call but [sic] I've told you folks about.  I, you either gotten stuff emailed, letters or phone calls from them and you guys are persisting in this matter and that's not a good thing. |
| [Collector]: | That's, that's the reason why we haven't um, stop contacting you because we haven't heard from them. |
| [Mr. Sanford]: | Ok.  Well then I'll make a point of it to make sure they get a hold of you. |
| [Collector]: | Yes sir. |
| [Mr. Sanford]: | Alright.  Thank you. |
| [Collector]: | Ok. |
| | [End of Call] |

Notwithstanding Mr. Sanford's "guarantee" that his attorney would "be getting a hold of you tomorrow," the attorney did not call Defendant the next day.  Or anytime thereafter.  Instead, about a month later the attorney filed this suit on Mr. and Mrs. Sanford's behalf.

**E**

Specifically, on April 4, 2012, the three-count complaint was filed on Plaintiffs' behalf. It alleges that Defendant violated the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 et seq., and Michigan law.  The case was referred to Magistrate Judge Charles Binder for general case management.  After the parties filed cross-motions for summary judgment, Judge Binder issued a report recommending that Defendant's motion be granted and Plaintiffs' motion be denied.  Plaintiffs object.

**II**

The district court will make a "de novo determination of those portions of the report . . . to which objection is made." 28 U.S.C. § 636(b)(1). The court is not obligated to review the portions of the report to which no objection was made. *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985).

**III**

**A**

Plaintiffs first object to Judge Binder's conclusion that Defendant did not violate 15 U.S.C. § 1692c(a)(2). Specifically, Plaintiffs assert that Defendant could have readily ascertained the name and address of Plaintiffs' attorney from the January 2012 conversations.

**1**

The FDCPA, as noted, is fundamentally a consumer protection statute — but it also protects law-abiding debt collectors. *See Fed. Home Loan Mortg. Corp. v. Lamar*, 503 F.3d 504, 510 (6th Cir. 2007) ("The FDCPA is not one-sided."). The Sixth Circuit explains that "the broadly sweeping regulations of the statute protect consumers from abusive debt collection practices." *Id.* (quoting *Jacobson v. Healthcare Fin. Servs., Inc.*, 434 F. Supp. 2d 133, 139 (E.D.N.Y. 2006)). Yet "the enacted purpose of the statute is equally to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged." *Lamar*, 503 F.3d at 510 (quotation marks omitted) (quoting 15 U.S.C. § 1692e; *Jacobson*, 434 F. Supp. 2d at 139).

Section 1692c(a)(2) exemplifies this balanced approach. It prohibits debt collectors from contacting consumers who are represented by an attorney — but only if the collector "has

knowledge of, or can readily ascertain, such attorney's name and address." *Id*. In pertinent part, the statute provides:

> (a) Communication with the consumer generally
>
> > Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with the collection of any debt . . .
> >
> > (2) if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address.

Thus, a consumer must establish two elements for a § 1692c(a)(2) claim. *See McKeown v. Mary Jane M. Elliott P.C.*, 07-12016-BC, 2007 WL 4326825, at *5 (E.D. Mich. Dec. 10, 2007). First, the debt collector must actually know that the consumer is represented by an attorney with respect to the debt. And second, the debt collector must have knowledge of, or be able to "readily ascertain, such attorney's name and address." § 1692c(a)(2).

Here, Plaintiffs don't establish the second element. Mr. Sanford first informed Defendant that the couple had retained an attorney during the conversation on January 11, 2012. Mr. Sanford did not, however, inform Defendant what the attorney's name or address was. Nor did he give Defendant a chance to ascertain the attorney's name or address. Mr. Sanford simply said "we've already got an attorney" and hung up.

Eight days later, Mr. Sanford called Defendant. During this conversation Mr. Sanford did not disclose his attorney's name or address. In fact, Mr. Sanford did not indicate that he was represented by an attorney (much less that it was the attorney who had directed Mr. Sanford to call Defendant).

The next conversation occurred on March 11, 2012. During this conversation, Mr. Sanford finally disclosed his attorney's name — the law firm of Nitzkin & Associates. This was

the first time that Defendant knew the attorney's name and could "readily ascertain" the attorney's address.

And after this disclosure, Defendant did not attempt to communicate with Plaintiffs. Defendant did not violate § 1692c(a)(2).

**2**

Arguing against this conclusion, Plaintiffs write that "the name and address of Plaintiffs' counsel was readily ascertainable to [Defendant] during the January 11th and January 19th telephone conversations with Mr. Sanford, but Defendant made no effort to inquire as to that information . . . in an effort to remain willfully ignorant of the name and address of Plaintiff's [sic] counsel."

Contrary to Plaintiffs' assertion, there is no evidence of willful ignorance.   The conversation on January 11 ended with Mr. Sanford saying "we've already got an attorney" and hanging up before Defendant could ask another question.

The conversation on January 19 is likewise unhelpful to Plaintiffs' cause.   Plaintiffs' theory, evidently, is that Defendant was in the wrong because it could have "readily ascertained" the attorney's name and number from Mr. Sanford.   That Mr. Sanford initiated the communication, did not disclose that he was calling at the direction of his attorney, and did not even mention that he was represented by an attorney does not alter this conclusion, Plaintiffs implicitly suggest.

But Plaintiffs offer no case in which a court has found a defendant liable under such circumstances.   And an independent review reveals none.

As noted, the Sixth Circuit cautions: "The FDCPA is not one-sided." *Lamar*, 503 F.3d at 510.  While it protects consumers from abusive tactics of debt collectors, it is also "equally" designed to protect debt collectors. *Id*.

Here, any abusive tactics were employed by Mr. Sanford — not Defendant.  Mr. Sanford, not Defendant, misrepresented the substance of the conversation that the parties had eight days before.  Mr. Sanford, not Defendant, misrepresented that he had no idea what the underlying debt was.  Mr. Sanford, not Defendant, misrepresented that he would be in touch shortly.

It is possible, of course, that Mr. Sanford's repeated misstatements were unintentional.  But if so, such an unreliable source cannot be viewed as a reasonable way to "readily ascertain" an attorney's name and contact information.   Conversely, if Mr. Sanford's repeated misstatements were intentional, he stands as an even more unreliable source.

Drawing all reasonable inferences in Plaintiffs' favor, Defendant could not be expected to either know or have the ability to "readily ascertain" the attorney's name and contact information from the January 19 conversation.

Reinforcing the reasonableness of Defendant's conduct is the March 11 conversation.  It was during this conversation, as noted, that Mr. Sanford first disclosed the attorney's name.  Following this disclosure, Defendant made no attempt to contact Plaintiffs.

Plaintiffs' first objection will be overruled.

## B

Plaintiffs' second enumerated objection is not actually an objection at all.  They write: "While Plaintiff [sic] does not object to the Magistrate Judge's Report and Recommendation regarding their claims under 15 U.S.C. § 1692d, it is important to note that the Magistrate Judge

erred in finding that the disclosure requirements set forth under 15 U.S.C. § 1692d do not apply the Defendant's telephone conversations with Mr. Sanford."

By their own acknowledgement, Plaintiffs thus do not object to Judge Binder's suggested resolution of Plaintiffs' § 1692d claim.  And as noted, a court is not obligated to review the portions of the report to which no objection was made.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985).  Accordingly, this Court declines to do so for Plaintiffs' § 1692d claim.

### C

Plaintiffs' third enumerated objection is to the report's conclusion that Defendant did not violate either 15 U.S.C. §1692e(2)(A) or (10).

### 1

Section 1692e generally prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt."  § 1692e. Pertinent to Plaintiffs' objection, subsection (2)(A) also specifically prohibits "[t]he false representation of . . . the character, amount, or legal status of any debt."  § 1692e(2)(A).  And subsection (10) prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."  § 1692e(10).

### 2

Plaintiffs' objection here is actually three discrete, interrelated objections to Judge Binder's recommendation regarding Defendant's statements during the two conversations in January.  Each sub-objection is addressed in turn.

### a

Plaintiffs first object that Judge Binder "erred in finding that there is no evidence that Plaintiff Mark Sanford was ever told anything but that the debt was Mrs. Sanford's alone based

on her J. C. Penny account."  Plaintiffs write: "Defendant plainly attempted to collect the debt from Mr. Sanford, telling him that the account was 'your account' on January 11, 2012." Plaintiffs continue: "at the very least, there is a genuine dispute as to whether Defendant ever told Mr. Sanford that he was responsible for the debt based on the least sophisticated consumer standard."

Plaintiffs are correct that "least sophisticated consumer standard" applies.  *E.g.*, *Lewis v. ACB Bus. Serv., Inc.*, 135 F.3d 389, 400 (6th Cir. 1998).  Plaintiffs are not correct, however, that under this standard a genuine issue of material fact exists.  Nor are Plaintiffs correct that Defendant attempted to collect the debt from Mr. Sanford or told him that it was his account.

As a threshold matter, it should be noted that while "the standard is that of the least sophisticated consumer, the communication is to still be carefully viewed in its entirety." *McKeown*, 2007 WL 4326825, at *7 (citing *Fed. Home Loan Mortg. Corp. v. Lamar*, 503 F.3d 504, 511 (6th Cir. 2007)).

Here, the communication between Defendant and Mr. Sanford involved four conversations (including two in January 2012).  To put the particular conversations in question in context, a view of the exchanges leading up to them is necessary.

In the first conversation (on July 1), Defendant began by asking for Mrs. Sanford.  When Mr. Sanford said she was unavailable, Defendant explained: "I'm calling today from here at Portfolio Recovery Associates in regards to *your wife's* old J.C. Penny account."  It bears reiterating, "your wife's account."   And, although Plaintiffs implicitly acknowledge that Defendant made no attempt to collect the debt from Mr. Sanford during this conversation, the July 1 conversation nevertheless concluded with Mr. Sanford offering to pay it.  He explained that "if you call back say, week to 10 days business days, um . . . I'll just give you the money."

Defendant called back 16 days later.  No answer.  And so it went for several months.  Defendant's second conversation with Mr. Sanford occurred in January 2012.  It is this conversation, as noted, that Plaintiffs allege that Mr. Sanford was told it was "your account."  Plaintiff's allegation finds no support in the record.  Once again, the conversation began with Defendant asking to speak with Mrs. Sanford.  Once again, Mr. Sanford said she was not available. Defendant then launched into the statutorily required disclosures, explaining: "I'm calling from Portfolio Recovery Associates regarding *her account* with J.C. Penny.  This is an attempt to collect a debt by a debt collector and any information obtained will be used for that purpose."  Mr. Sanford responded: "You know what?  That's just great cuz this debt was back in 1989 which means that you guys are falsifying records."  He then hung up.

It again bears reiterating, "her account."  Like the first conversation, Defendant did not tell Mr. Sanford that it was "his account."  The opposite, in fact.

Eight days later, Mr. Sanford called Defendant.  Again, the conversation began with Defendant making plain "we're looking for a Tammy Sanford."  Mr. Sanford then countered:

> Well, we've never received anything in writing when I spoke with an agent on January 11th. . . .  I asked her ok, you know, please, you don't need to call this number until you send me like some paper work or something and I haven't received anything yet.  We don't even know what this is about.

Defendant then explained once again that it was calling regarding Mrs. Sanford's J.C. Penny account.  And Defendant expressly emphasized: "It's not a joint account.  *She's the only person on this account and it's under Tammy Sanford*."

Viewed in their entirety, from these conversations not even the least sophisticated consumer would think that Defendant was attempting to collect the debt from Mr. Sanford rather than his wife.  As the Sixth Circuit explains, while the least sophisticated consumer standard protects "naive consumers, it also prevents liability for bizarre or idiosyncratic interpretations of

[a consumer] by preserving a quotient of reasonableness and presuming a basic level of understanding." *See Fed. Home Loan Mortg. Corp. v. Lamar*, 503 F.3d 504, 509 (6th Cir. 2007). Plaintiffs' first objection to the recommendation regarding their § 1692e claim lacks merit.

**b**

Plaintiffs next object that the report "erred in finding . . . that Defendant's statement that it had spoken to Mrs. Sanford who promised payment could not cause even the least sophisticated consumer any confusion."

Plaintiffs are correct that Defendant misspoke during the January 19 conversation, misinterpreting its notes of the July 1 conversation that it had spoken to the "spouse" to refer to Mrs. Sanford rather than Mr. Sanford. Plaintiffs are not correct, however, that the report errs in concluding that Defendant is entitled to summary judgment on the § 1692e claim.

Section 1692e, as noted, prohibits "false" representations by a collection agency. The Sixth Circuit cautions, however, that the false statement must be "material." *Miller v. Javitch, Block & Rathbone*, 561 F.3d 588, 596 (6th Cir. 2009) (quoting *Hahn v. Triumph P'ships LLC*, 557 F.3d 755, 757 (7th Cir. 2009) (Easterbrook, J.)).

As Judge Easterbrook explained in *Hahn*: "The statute is designed to provide information that helps consumers to choose intelligently, and by definition immaterial information neither contributes to that objective (if the statement is correct) nor undermines it (if the statement is incorrect)." 557 F.3d at 757–58; *see also Muha v. Encore Receivable Mgmt., Inc.*, 558 F.3d 623, 628 (7th Cir. 2009) (Posner, J.) ("The purpose of the Fair Debt Collection Practices Act is to protect consumers, and they don't need protection against false statements that are immaterial in the sense that they would not influence a consumer's decision."). Thus, a statement being "false in some technical sense" is insufficient if it "would not mislead the unsophisticated consumer."

*Hahn*, 557 F.3d at 757 (quoting *Wahl v. Midland Credit Mgmt., Inc.*, 556 F.3d 643, 646 (7th Cir. 2009)), *quoted in part in Miller*, 561 F.3d at 596.

The standard is objective; viewed in its entirety, the statement must be false and one which "would confuse the unsophisticated consumer." *Wahl*, 556 F.3d at 646. And the "least sophisticated consumer," as noted, is assumed to have "a basic level of understanding." *Lamar*, 503 F.3d 504, 509 (6th Cir. 2007). That is, this hypothetical person is "uninformed, naive, and trusting, but possesses . . . reasonable intelligence, and is capable of making basic logical deductions and inferences." *Williams v. OSI Educ. Servs., Inc*, 505 F.3d 675, 678 (7th Cir. 2007) (quotation marks and brackets omitted) (quoting *Pettit v. Retrieval Masters Creditor Bureau, Inc.*, 211 F.3d 1057, 1060 (7th Cir. 2000). The least sophisticated consumer is naïve, not an idiot. *Wahl*, 556 F.3d at 645 ("The 'unsophisticated consumer' isn't a dimwit.")

Here, Defendant indisputably made false statements to Mr. Sanford on January 19. Defendant said that it had spoken to Mrs. Sanford on July 1, 2011, that she said she "just got back to work from being off for 3 months," and would repay the debt in a week or two was indisputably "false in some technical sense." In fact, Defendant had talked to Mr. Sanford, who said that *he* just got back to work from being off for 3 months and would repay the debt in a week or two.

Viewed in context, Defendant's misstatement that it had spoken to Mr. Sanford's wife would not mislead a person of reasonable intelligence. Such a person in Mr. Sanford's position would realize that he had been confused for his wife. It was Mr. Sanford, after all, who in July 2011 had "just got back to work from being off for 3 months." And it was Mr. Sanford who had said he would repay the debt in a week or two.

Moreover, during the same January 19 conversation Defendant made it plain that it was seeking to collect the debt from Mrs. Sanford — not Mr. Sanford.  Defendant explained: "It's not a joint account.  *She's the only person on this account*."

At no point during this conversation —or any other for that matter — did Defendant ask Mr. Sanford to pay the debt.  Under the circumstances, a reasonable person in Mr. Sanford's position would not be confused into believing that he was liable for the debt.[4]  Plaintiffs' second objection to the recommendation regarding the § 1692e claim lacks merit.

<b>c</b>

Plaintiffs' third objection argues that Defendant violated §1692e by "making false statements regarding the time-barred status of the alleged debt."  Plaintiffs elaborate: "During the January 19, 2012, telephone conversation [Defendant's] representative told Mr. Sanford that 'there isn't a statute of limitations, it's just for the amount of time we're legally able to report on your credit report.'"  Plaintiffs further assert that "the only question is whether [Defendant's] statements regarding the statute of limitations were false."

Plaintiffs are incorrect about the facts and the law.  As a matter of fact, Defendant did not say "there isn't a statute of limitations" during the January 19 call — but the opposite. Defendant expressly informed Mr. Sanford during the call: "There's a statute of limitations." Defendant then went on to correctly point out that although the statute of limitations had run, this did not bar Defendant's right to attempt to collect on the debt.  *See, e.g.*, *Green v. NCO Inovision,* No. 09–410, 2010 WL 147934, at *3 (D.N.J. Jan.11, 2010) (collecting cases and noting that "it is well settled" that an attempt to collect a debt for which the statute of limitations had expired "does not violate the FDCPA"); *Martsolf v. JBC Legal Grp., P.C.,* No. 04–1346,

---

[4] As an aside, it should be noted that the alleged misstatements had absolutely no effect on Plaintiff's decisions.  They did not prompt Mr. Sanford to say "well, if my wife promised to repay the $106 debt I guess I'll have to pay that $106."  Nor did they prompt Mrs. Sanford to contact Defendant, much less pay the debt.

2008 WL 275719, at *4 (M.D. Pa. Jan. 30, 2008) ("[A] debt collector may request voluntary repayment of the debt but may not threaten suit based upon it.").  As another district court explains: "While a statute of limitations may bar the use of judicial remedies to enforce a particular right, it does not eliminate the underlying right."  *Huertas v. Galaxy Asset Mgmt.,* No. 09–2604, 2010 WL 936450, at *3 (D.N.J. Mar. 9, 2010).

Plaintiffs are also incorrect as a legal matter that "the only question is whether [Defendant's] statements regarding the statute of limitations were false."  As noted, to be actionable under §1692e a statement must be both false and material.  *Miller*, 561 F.3d at 596.

Here, Plaintiffs do not establish either element.  As noted, Defendant's representation that the statute of limitations did not bar Defendant's right to attempt to collect on a stale debt was correct.  Even if it had been, moreover, it was not material.  In the January 19 conversation, Mr. Sandford bluntly asked: "But could you guys file a lawsuit against us because of this?"  He received an equally blunt response: "No.  It's $106.00. . . .  No, it's $106.00."

Under the circumstances, a reasonable person would not be confused into believing that he was facing a lawsuit.  Defendant had said twice that it would not be suing.  Any misstatements made by Defendant regarding the statute of limitations were therefore immaterial.  Plaintiffs' objection to the recommendation regarding the § 1692e claim lacks merit.

**D**

Plaintiffs fourth enumerated objection to the report is that it "erred by failing to even discuss Plaintiff's [sic] argument regarding Defendant's violation of 15 U.S.C. § 1692e(10)."  Plaintiffs are correct that the report does not expressly address subsection 10; they are not correct that the recommendation that Defendant is entitled to judgment on the § 1692e claim is erroneous.

The least sophisticated consumer and the materiality requirements of § 1692e applies to claims brought under both subsections (a)(2) and (10).  *Miller*, 561 F.3d at 596.  And for reasons detailed above, Plaintiffs have not shown that any of the alleged false representations were material or that they would mislead the least sophisticated consumer.  This objection lacks merit.

**E**

Finally, Plaintiffs object to the report's recommendation that the Court decline to exercise supplemental jurisdiction over their state law claims.

The United States Code provides: "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(a).

The Sixth Circuit, moreover, instructs that "a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims."  *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (citation omitted);  *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); *Perry v. Se. Boll Weevil Eradication Found.*, 154 F. App'x 467, 478 (6th Cir. 2005) (noting that dismissal is the "clear rule of this circuit").  As the Supreme Court explains, "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."  *Gibbs*, 383 U.S. at 726.

Plaintiffs' final objection will be overruled.

**IV**

Accordingly, it is **ORDERED** that the report and recommendation (ECF No. 46) is **ADOPTED**.

It is further **ORDERED** that Plaintiffs' objections (ECF No. 47) are **OVERRULED**.

It is further **ORDERED** that Defendant's motion for summary judgment (ECF No. 38) is **GRANTED**.

It is further **ORDERED** that Plaintiffs' motion for summary judgment (ECF No. 37) is **DENIED**.

It is further **ORDERED** that count one of the amended complaint is **DISMISSED**.

It is further **ORDERED** that supplemental jurisdiction over counts two and three of the amended complaint is **DECLINED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: July 22, 2013

| PROOF OF SERVICE |
| --- |
| The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 22, 2013. |
| s/Tracy A. Jacobs |
| TRACY A. JACOBS |